ASHLAND OIL, INC., a Kentucky corporation, Appellant,

v.

REALTY FARM DEVELOPMENT COMPANY, INC., a Kentucky corporation, Appellee.

Court of Appeals of Kentucky.

Oct. 6, 1972.

Warren N. Pope, Ashland, Angus W. McDonald, McDonald, Alford & Roszell, Lexington, for appellant.

F. Selby Hurst, William O. Gilbreath, Lexington, for appellee.

STEINFELD, Chief Justice.

This appeal concerns the determination of whether a subsequent lessee is bound by the restrictive covenants in a lease between a common lessor and a prior lessee and whether a grocery may be operated in an automobile service station. Appellant Ashland Oil, Inc. (formerly Ashland Oil and Refining Co.), is the subsequent lessee and Winn-Dixie, Louisville, Inc., is the prior lessee. Appellee Realty Farm Development Company, Inc., is the common lessor and W. F. Blackerby is its president.

On May 19, 1958, Realty Co. leased to Winn-Dixie a tract of land located in Idlehour Shopping Center, Lexington, Kentucky. The lease was to run for ten years, but it has since been extended to expire on January 5, 1974, unless Winn-Dixie renews under its option for an additional five-year period. It provides in part:

"Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the above described shopping center. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within said shopping center or within 500 feet of any exterior boundary thereof for occupancy as a grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in such business without written permission of the Tenant."

On July 22, 1968, Realty Co. entered into a lease with Ashland for a tract located within 500 feet of the aforementioned shopping center " * * * to be used for automobile service station purposes." The primary term of ten years began on " * * * the first day upon which petroleum products are sold from the premises or one hundred twenty (120) days after (a determinable date)." The tenant was granted four option terms, each for five years. The monthly rent was 1¢ per gallon of gasoline sold with a minimum of $100 per month. The lease provides:

"Lessee agrees to erect upon the premises at its own expense a modern colonial style brick service station and necessary equipment therefor, which said improvements, excluding fixtures and equipment, shall become the property of Lessor at the termination of this lease as extended."

The erected automobile service station included the customary pumps and a structure with three bays for repairing and servicing motor vehicles and space for the usual equipment necessary for carrying on services normally attributed to a complete automotive service station. Operations continued according to conventional standards for nearly two years, when in March 1971 it became apparent to Ashland that sales were substantially deficient. It concluded that profitable operations could be obtained only by converting the three bays into what was designated a "500 Food Mart", a quick-service, convenience-type grocery store. This was accomplished by removing all the automotive service fixtures and equipment from the service bays, installing a grocery-type floor and bricking in the doors, thereby leaving only windows and a door for pedestrian traffic. Afterward, the only activity that outwardly remained relating to the operation of a service station was the selling of petroleum products.

Blackerby testified that he was not consulted about the station's conversion and learned of it one day when he went there to buy gas and noticed the change-over taking place. He asked what was going on and was told " * * * they were going to put in a convenient market," to which he

replied, "No, you couldn't do that, we have got a lease with Winn-Dixie which prohibits that, * * *." Blackerby orally notified Ashland that it could not operate a grocery store on the premises because of the provisions in the Winn-Dixie lease; however, despite his protests, the conversion of the station continued and Ashland steadfastly maintained that it had a right to use the property for any legal purpose.

Realty Co. sued Ashland claiming that the grocery use was in violation of the restrictive covenant of the Winn-Dixie lease and the terms of its own lease. It pleaded that by reason of such unauthorized use Winn-Dixie could terminate its lease. Realty Co. also demanded that Ashland's lease be adjudged to forbid the use of the premises as a grocery, that Ashland be held to have breached its lease and, in the alternative, that Ashland either be evicted or permanently enjoined from using the property for a grocery.

On deposition Blackerby was asked whether he had notified any of Ashland's representatives of the existence of the restrictions in the Winn-Dixie lease. He testified:

"* * * I recall the first time standing in the middle of the lot talking with Mr. Martin (Ashland's representative) and with some other gentleman, * * * We talked about the use of the lot, about the fact of what Texaco was doing on one corner and about the fact that Humble was going down below them, and they didn't know what to do. I said, 'We can sell this lot or lease this lot to a Convenient Market. We have had Atlanta come to see us, we have had P.D.Q. (a grocery chain) come and try to lease it, but we told them we couldn't, we had Dr. Sublett wanting to lease it for a restaurant. We have got the same provision with Frisch's (a restaurant located in the shopping center).'

"Q42 Is this the conversation you had with Joe Martin?

"A Yes, that was before we signed anything. We are just talking about considering it. I sat on the back porch with Mrs. Blackerby and talked about the possibilities of this lot. They knew we couldn't have a grocery store."

The conversation about, and knowledge of, the restrictive covenant was denied by Martin and another representative of Ashland. The proof showed that the Winn-Dixie lease was never recorded and never exhibited to Ashland's representatives.

Trial was held before the court, without a jury. In a comprehensive opinion that included findings of fact and conclusions of law, the chancellor found that *before* Realty Co. leased to Ashland "* * * the conversation as related by Mr. Blackerby did take place." The court continued "* * * neither party contemplated at the time of the execution of the lease that the property would be used other than as a service station." The chancellor held that Ashland was not bound by the restrictive covenant in the Winn-Dixie lease because "* * * the conversation was not intended to put Ashland on notice of the provisions of the Winn-Dixie lease * * *." He reasoned that the restrictive covenant in the Winn-Dixie lease was not a basis on which Realty Co. could prevail. However, the chancellor found the conversion of the service station into a grocery was repugnant to the use contemplated by the Realty Co.-Ashland lease.

The court allowed Ashland a period for liquidating its present grocery inventory [1] and thereafter it was enjoined from operating a grocery upon the leased premises throughout the remainder of the term of the lease or any extension thereof.

Ashland continues to argue that it is not bound by the restrictive covenant in the lease between Realty Co. and Winn-Dixie. Realty Co. responds that "Whether intended as notice or not, the fact remains (as found by the chancellor) that appellant

1. Realty Co. did not appeal or cross appeal.

was given actual notice of the restriction in the preexisting Winn-Dixie lease and was and is now bound by that notice." We agree.

In Vaughan v. General Outdoor Advertising Co., Ky., 352 S.W.2d 562 (1962), we held that where a subsequent lessee has notice of a restrictive covenant in a prior lease he is bound thereby because " * * * a party with knowledge of the just rights of another should not be permitted to defeat them." See generally 51C C.J.S. Landlord and Tenant § 238, p. 619; 49 Am.Jur.2d, Landlord and Tenant, § 162, p. 187; and 97 A.L.R.2d 4.

In Buckaway v. J-Town Center, Inc., Ky., 475 S.W.2d 642 (1972), we reviewed Vaughan and stated that it was not controlling " * * * because there (in Vaughan) it was found that the subsequent lessee had notice of the restrictive covenant", whereas in Buckaway there was no notice. We further stated:

> "Although the opinion is not clear as to when the subsequent lessee received notice, it must be presumed to have been prior to entering into its own lease or at least prior to incurring any expense or liability as a result thereof. Otherwise, the question of notice would be immaterial."

Suit was brought by the prior lessee against the lessor and subsequent lessee for an injunction to enforce the covenant and damages caused by its breach. We held that the subsequent lessee was not liable because it acted totally without knowledge of the restrictions, but the lessor was, and we remanded the case for an assessment of damages. We stated, " * * * we now hold that a subsequent lessee must have notice of the rights of the other lessee prior to executing his own lease. Such notice can quite simply be given by recording the lease instrument containing the restrictive covenant." We hasten to add "or by actual notice."

The chancellor having held that Blackerby told Ashland's representatives of the restrictive covenant in the Winn-Dixie lease before Ashland leased its tract, we believe, despite what his motivations or intentions were at the time, Blackerby gave adequate notice. The information was communicated directly and personally to those with whom he was primarily dealing. While his words may not have been couched in terms which would convey to Ashland all the particulars of the restrictions in the Winn-Dixie lease, he did bring home to Ashland the thrust of its provisions.

We find it unnecessary to reach the issue of whether a lease of land "for automobile service station purposes" authorized the lessee to include a grocery store.

The judgment is affirmed.

All concur.